Opinion filed October 6, 2020

Modified upon denial of
Rehearing November 4, 2020

2020 IL App (4th) 170787

NO. 4-17-0787

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| KELVIN T. HARTFIELD, | ) | No. 16CF1055 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justices Knecht and Turner concurred in the judgment and opinion.

**OPINION**

¶ 1       In the Champaign County circuit court, a jury found defendant, Kelvin T. Hartfield,

guilty of one count of armed robbery (720 ILCS 5/18-2(a)(2) (West 2016)) and four counts of

aggravated discharge of a firearm (*id.* § 24-1.2(a)(3)). For those offenses, the court sentenced him

to prison terms that, in their consecutive running, totaled 90 years. He appeals on six grounds.

¶ 2       First, defendant claims a violation of his statutory right to a speedy trial. See 725

ILCS 5/103-5(a) (West 2016). He acknowledges that he has procedurally forfeited this claim.

Nevertheless, he seeks to avert the forfeiture by invoking the doctrine of plain error (see Ill. S. Ct.

R. 615(a) (eff. Jan. 1, 1967)), purportedly because the error is so serious that the integrity of the

judicial process is endangered (see *People v. Sebby*, 2017 IL 119445, ¶ 50). Setting aside the

question of whether a statutory speedy-trial violation, as distinct from a constitutional speedy-trial

violation, is an error so fundamental as to threaten the integrity of the judicial process, we find no

error, let alone a plain error. The reason is this. When the State moved for the continuances at issue, defendant objected but not in the manner required by section 103-5(a) (725 ILCS 5/103-5(a) (West 2016)), that is, by demanding a trial. Consequently, under that statutory provision, notwithstanding defendant's objections and the circuit court's recognition of his objections, he is considered to have agreed to the continuances, eliminating the possibility of a statutory speedy-trial violation. See *id.*

¶ 3 Second, defendant asserts that his appointed trial counsel rendered ineffective assistance by failing to move for a discharge on statutory speedy-trial grounds and by failing to raise the issue in the posttrial motion, thereby causing a forfeiture of the issue. For the reason set forth in the preceding paragraph, there was no statutory speedy-trial claim for defense counsel to forfeit.

¶ 4 Third, defendant alleges a violation of his constitutional right to have the jury selected in public. In the record before us, we find inadequate support for defendant's allegation that this right was violated.

¶ 5 Fourth, defendant complains of violations of Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) in the admonitions the circuit court gave the potential jurors and in the inquiries the court made of them. We find a procedural forfeiture of this issue. Again, defendant seeks to avert the forfeiture by invoking the doctrine of plain error, this time arguing that the evidence was so closely balanced that the purported Rule 431(b) errors could have made a difference in the outcome of the trial. We find no error in the admonitions. And assuming that, in its questioning of the potential jurors, the court erred by substituting one word in Rule 431(b) for another word that carried the same meaning, we find no possibility of prejudice.

¶ 6        Fifth, defendant contends that, in answering a mid-deliberation question by the jury, the circuit court violated his right to due process by lightening the State's burden of proof as to some elements of aggravated discharge of a firearm. We disagree that the court's answer to the jury's question had any such import.

¶ 7        Sixth, defendant contends that his four convictions of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(3) (West 2016)) violate the one-act, one-crime doctrine. Because the multiple convictions are inconsistent with statutory law, we do not reach the one-act, one-crime doctrine. In our interpretation of section 24-1.2(a)(3), we find no textual support for basing the number of convictions on the number of peace officers in the direction of which defendant discharged the firearm.

¶ 8        Therefore, we remand this case with directions to vacate three of the convictions of aggravated discharge of a firearm and to resentence defendant. Otherwise, we affirm the judgment.

¶ 9                                    I. BACKGROUND

¶ 10       On July 27, 2016, the police arrested defendant. Ultimately, the State charged him with one count of armed robbery (*id.* § 18-2(a)(2)) and four counts of aggravated discharge of a firearm (*id.* § 24-1.2(a)(3)).

¶ 11       From August 2016 to January 2017, the State filed six motions to continue the jury trial so that the State could obtain the results of fingerprint and DNA analyses. See 725 ILCS 5/103-5(c) (West 2016).

¶ 12       In its first motion for a continuance, the State "request[ed] a continuance and an additional 60 days as provided by [section 114-4 of the Code of Criminal Procedure of 1963] 725 ILCS 5/114-4 [(West 2016)] and 120 days as provided [by section 103-5(c) (*id.* § 103-5(c))] to bring the matter to trial as it continue[d] to pursue the referenced forensic evidence."

¶ 13        On August 30, 2016, in the hearing on the State's first motion for a continuance, defense counsel objected to the motion as follows:

> "Judge, he's in custody.
>
> Ready for trial.
>
> Please note my objection to the State's motion."

Noting the objection, the circuit court overruled it and extended the speedy-trial period by 120 days, to March 26, 2017.

¶ 14        Finally, jury selection began on March 6, 2017, after defendant had been in custody for 222 days. The circuit court announced:

> "For the People in the courtroom, I've got 39 jurors coming up. There's not going to be enough room for everybody to be seated, and my jurors. I'm going to have you step out until I get a jury selected. All right, Officer, bring up the jurors, please.
>
> DEPUTY: Yes, [Y]our Honor.
>
> THE COURT: Mr. Vargas, any problem with the statement of the nature of the case?
>
> MR. VARGAS: No, sir. Judge, Ms. Gwendolyn Hartfield is in the room, as well as her mother, and obviously, one of our interns. Can they stay in the room and, if necessary, do you want them all to leave?
>
> THE COURT: As soon as I get twelve in the box, then I'll have Officer Helm bring them in, so at least I'll have all of my jurors seated."

Between the time when the court ordered the spectators to leave the courtroom to the time when the first 12 venire members were seated in the jury box, the court read the charges, the list of potential witnesses, and the initial jury instructions, and the venire members were sworn.

¶ 15	To each panel of potential jurors, the circuit court read the four principles in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) all at once and then had some version of the following dialogue with the panel:

"THE COURT: The four of you understand those instructions. Is that correct?

FOUR JURORS: (Indicating in the affirmative).

THE COURT: They answer in the affirmative. And the four of you will follow those instructions. Is that correct?

FOUR JURORS: (Indicating in the affirmative).

THE COURT: They answer in the affirmative."

¶ 16	After the jury was selected, the trial began. In a nutshell, the evidence in the jury trial tended to show the following.

¶ 17	Around 1 a.m. on July 26, 2016, two masked men, one of them wielding a revolver, robbed a gas station in Urbana, Illinois. They took not only the cash in the register but also numerous cartons of cigarettes and cigars, which they carried away in a backpack. The gas station attendant saw a tan Buick automobile drive away.

¶ 18	Soon afterward that night, while surveilling another gas station, a deputy sheriff, Josh Demko, looked over at a nearby trailer park and saw a tan Buick back into a parking spot, next to a maroon Hyundai automobile. Demko and some other police officers went into the trailer park to investigate. A man was sitting in the front passenger seat of the Hyundai, and a woman was sitting in the back seat. The man got out of the Hyundai and walked to the trunk and then past the driver's door. He appeared to be, like defendant, a tall black man of a slender build, but none of the police officers got a good enough look at him to positively identify him, in the trial, as

defendant. The man ran when the police ordered him to stop. As he was running, he fired in the direction of the four police officers: Demko, Richard Ferriman, Casey Donovan, and Rob Derouchie, all of whom were more or less clustered together. Some of the police officers returned fire. The man went over a fence and got away.

¶ 19 The four police officers differed on how many shots the fleeing man had fired. He fired two to five shots, according to their testimony. None of the officers were hit, although, afterward, they found what appeared to be two bullets holes in trailers near where some of them had been standing.

¶ 20 After the shoot-out, the police arrested the woman in the back seat of the Hyundai, Tierykah Wiley. She made several statements to the police, and not all of her statements agreed with one another. In one of her statements, Wiley represented that, the day of the robbery, she accepted a ride in a tan car driven by Kydel Brown. Defendant was in the front seat of the tan car, and she, Wiley, was in the back seat. She saw a lot of cigarettes on the floorboard. They drove to a nearby trailer park to switch cars. Brown got out of the tan car and went inside one of the trailers. Wiley got out of the tan car, too, and into a red car, and defendant moved some bags from the tan car to the trunk of the red car.

¶ 21 In the maroon Hyundai, the police found several items of evidence, including the following: a cell phone with accounts relating to Brown; mail addressed to defendant; a package of photographs with defendant's name on it; a garbage bag containing a single carton of Newport cigarettes; a blue and black backpack and a blue and gray backpack, each containing cartons and individual packs of Newports and packages of cigars; and Newports that were not in any bag. In all, the police found, in the maroon Hyundai, 15 cartons and 16 individual packs of Newports and about 28 packages of cigars.

¶ 22 Shortly after 8 a.m. on July 26, 2016, Brown emerged from a trailer that the police were surveilling, and they arrested him. The police searched the trailer and found the keys to the tan Buick.

¶ 23 At about 5 p.m. on July 27, 2016, the police were surveilling a hotel in which defendant's mother lived with her boyfriend. Defendant came out of the hotel and got into a taxi. The police pulled the taxi over and arrested defendant. He had a bandage on his forearm. Upon removing the bandage, the police saw a wound and took him to the hospital to get it treated.

¶ 24 On August 17, 2016, John Hampton was in the backyard of his house, which was near the trailer park, and he found a revolver in the weeds behind his shed. The revolver did not belong to him, and he did not know how it had gotten there. He picked up the revolver and called the police, who came and took possession of it. In the cylinder of the revolver were three spent rounds and two live rounds.

¶ 25 Lenore Smith, who lived near Hampton, testified that she had known defendant for 13 or 14 years and that, in the early morning hours of July 26, 2016, defendant awakened her by tapping on the window of her house. She opened the front door, and he came in. She noticed that he had a cut on his arm. He explained that he had gotten the cut by jumping a fence as he ran away from some "guys" who had wanted to fight him. Smith urged defendant go to the hospital and get the cut looked at, but he refused to do so. So, she herself bandaged the cut, which was about an inch and a half long and not bleeding.

¶ 26 Jamono Collier testified that she had known defendant for five or six years. Sometime on July 26, 2016, defendant telephoned Collier, looking for Collier's best friend, Wiley. Defendant requested Collier to "call the hospital or see if [Wiley] was in jail." Defendant gave Collier the following explanation for this request (as Collier recounted in her testimony):

"[T]hey was at a gas station and [Wiley] was in the back seat of a car or something, and I guess—well, I mean I guess—well, he said he shot at the police or whatever the case may be. *** He say he shot—was shooting at the police and he was with [Wiley] and he wasn't around her no more. *** [H]e was trying to locate her by me."

The prosecutor asked Collier:

"Q. Did he tell you more about the details of what happened after they separated? What did he do next?

A. He went to the trailer parks.

Q. Why?

A. I guess that's where he put the stuff at.

Q. What stuff?

A. That he took out the store.

Q. Did he talk—you said he was shooting. Did he talk about a gun?

A. Yeah.

Q. What did he say about the gun?

A. Well, I know he wanted to get a new gun but I don't know what happened with the other one."

¶ 27      Collier further testified that, when defendant came to her house the next day, he had a bandage on his arm and was still was looking for Wiley. He wanted to take Wiley with him out of town "because he didn't want to get caught."

¶ 28       In addition to the foregoing testimony, the State presented forensic evidence. No DNA or fingerprints were found on the revolver. Defendant's fingerprint was found, however, on the exterior front passenger door of the maroon Hyundai and on one of the packs of Newports.

¶ 29       Finally, the State presented cell phone evidence. Expert testimony and extraction reports showed several calls and text messages between defendant's cell phone and Brown's cell phone. One text message, transmitted from defendant's phone to Brown's phone at 9:43 p.m. on July 25, 2016, read: "U know anyone want square 5$ a pack[,] 3 for 10$[,] 5 for 20$[,] They shorts[.]" The State presented testimony that "squares" were cigarettes and that "shorts" were short cigarettes as distinct from long cigarettes. Approximately 10 messages were sent from defendant's phone to contacts other than Brown during the evening hours of July 25, 2016, in which defendant offered to sell cigarettes, cigarillos, and cigars. Some of the messages proposed a sale price of $45 per carton.

¶ 30       On March 9, 2017, the parties rested, and the jury retired to the deliberation room. During its deliberations, the jury sent out a written question to the judge. The note read: " 'Does suspect need to know there were four cops on the scene in the area where gun was fired to be guilty of all four counts of aggravated discharge of a firearm[?] Third proposition, that the Defendant knew that blank was a peace officer.' " In the discussion of what the reply should be, defense counsel interjected: "Judge, please note my objection to any—I believe the appropriate response is, you've been instructed as to the law. Please note my objection to any—anything beyond that." Over defense counsel's objection and with the prosecutor's approval, the circuit court sent the following written response to the jury:

"Question #1

No[.]

Question #2

You must determine based on the evidence which officer or officers, if any, may have been in the line of fire when the firearm was discharged."

¶ 31    After receiving that written clarification, the jury found defendant guilty of one count of armed robbery and four counts of aggravated discharge of a firearm. The circuit court entered judgment on each of the five guilty verdicts.

¶ 32    On April 3, 2017, defendant filed a motion for an acquittal or, alternatively, a new trial. He challenged the circuit court's decision to answer the jury's mid-deliberation inquiry. But he raised no speedy-trial issue.

¶ 33    On May 1, 2017, the circuit court denied defendant's posttrial motion. Immediately afterward, the court held a sentencing hearing. The court imposed concurrent sentences of 10 years' imprisonment for the aggravated-discharge convictions as to Demko, Derouchie, and Donovan; a consecutive 40 years' imprisonment for the aggravated-discharge conviction as to Ferriman; and a consecutive 40 years' imprisonment for the armed-robbery conviction.

¶ 34    On May 19, 2017, defendant moved for a reduction of the sentences. He argued that the total of 90 years' imprisonment was excessive, "essentially amount[ing] to a life sentence." He was 22 years old.

¶ 35    On October 23, 2017, the circuit court denied the post-sentencing motion.

¶ 36    On October 27, 2017, defendant appealed.

¶ 37                    II. ANALYSIS

¶ 38                    A. The Speediness of the Trial

¶ 39        Defendant acknowledges that because he never moved to be discharged on speedy-trial grounds and because he never raised a speedy-trial issue in his posttrial motion, the issue might be regarded as procedurally forfeited. See *People v. Alcazar*, 173 Ill. App. 3d 344, 354 (1988) (holding that, by failing to apply for discharge prior to his conviction and by failing to raise the speedy-trial issue in his posttrial motion, the defendant had forfeited his right to be discharged on speedy-trial grounds). By invoking the doctrine of plain error, however, defendant seeks to avert a procedural forfeiture. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967).

¶ 40        Plain-error analysis begins with the question of whether the defendant has identified an error. *People v. Winchester*, 2016 IL App (4th) 140781, ¶ 69. Defendant challenges only the first and third continuances that the circuit court granted to the State, arguing it was those continuances that caused a violation of his statutory right to be tried within 120 days after he was put in custody. See 725 ILCS 5/103-5(a) (West 2016). But if, on the other hand, the first continuance was attributable to defendant instead of to the State, defendant admits that the running of the 120-day period was suspended until the day the case went to trial and that, consequently, he has no statutory speedy-trial claim. To quote from defendant's brief, "if the August 30, 2016[,] continuance was lawful, [defendant's] new speedy-trial date was March 26, 2017, and his March 6, 2017[,] trial did not violate the speedy trial statute. 725 ILCS 5/103-5(c)."

¶ 41        The State observes that, on August 30, 2016, in the hearing on the State's first motion for a continuance, defense counsel announced his readiness for trial instead of demanding a trial as required by section 103-5(a) (*id.*). As a result, the State argues, the continuance from August 30, 2016, to March 6, 2017, is indeed attributable to defendant, and his statutory speedy-trial claim lacks merit. In support of that argument, the State cites *People v. Murray*, 379 Ill. App. 3d 153 (2008), in which the appellate court held that stating a readiness for trial and objecting to a

proposed delay, without "specifically ask[ing] for trial or us[ing] language that would reference the speedy-trial statute," was "not a sufficient oral demand for trial" (*id.* at 161).

¶ 42    Defendant rejoins that, in the hearing on the State's first motion for a continuance, defense counsel did more than announce a readiness for trial: defense counsel also used language that, according to defendant, could only be understood as referencing the speedy-trial statute. Defense counsel said: "Judge, he's in custody." See 725 ILCS 5/103-5(a) (West 2016) (providing that "[e]very person in custody in this State for an alleged offense shall be tried *** within 120 days from the date he or she was taken into custody"). And not only that, defendant argues, but the circuit court noted, for the record, defense counsel's objection to the continuance, thereby explicitly recognizing defense counsel's response as a *bona fide* objection—without being gainsaid by the State. From *Murray*, 379 Ill. App. 3d at 161-62, defendant derives the following holding, which he regards as applicable to his own case:

> "the defendant's declaration of readiness for trial, when coupled with his objection to a proposed trial delay, his additional use of 'language that would be used only in reference to [his] speedy-trial right,' *and* the trial court's recognition of the defendant's objection to the delay, is sufficient to affirmatively invoke the speedy-trial right." (Emphasis in original.).

¶ 43    *Murray*, however, is distinguishable in two ways. First, the language that *Murray* characterized as "clearly showing an intent to invoke the speedy-trial statute" was defense counsel's "stated *** desire that the delay be attributed to the State." *Id.* at 161. Such language, the appellate court reasoned, "would be used only in reference to [the defendant's] speedy-trial right." *Id.* In the present case, by contrast, defense counsel merely observed that defendant was "in custody." That observation, unlike the defense counsel's request in *Murray*, was not specifically

- 12 -

and exclusively relevant to the speedy-trial statute. It was relevant to delay in general. Objecting to a continuance because one's client is languishing in jail does not specifically invoke or allude to the speedy-trial statute the way a request to attribute the delay to the State would.

¶ 44       Second, as the appellate court in *Murray* pointed out, the circuit court's recognition of defense counsel's objection to a continuance was not the same as the circuit's recognition of a demand for trial. *Id.* In the present case, in the hearing on the State's first motion for a continuance, the circuit court recognized defense counsel's objection to the proposed 120-day continuance, but the court never characterized the objection as a demand for trial.

¶ 45       Under the language of section 103-5(a) (725 ILCS 5/103-5(a) (West 2016)), this distinction is crucial. That section provides: "Delay shall be considered to be agreed to by the defendant unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record." *Id.* That statutory provision is unambiguous, and we are supposed to "apply it straightforwardly, without reading [into it any] exceptions, limitations, or qualifications." *People ex rel. Webb v. Wortham*, 2018 IL App (2d) 170445, ¶ 31. Thus, under the plain language of section 103-5(a), an objection to a proposed delay, without a demand for trial, operates as an agreement to the delay—period: no exceptions, no limitations, no qualifications. In the hearing on the State's first motion for a continuance, defense counsel objected to the proposed continuance without demanding a trial. Unless the objection was made in a certain manner—"by making a *** demand for trial"—the objection was ineffectual, and the "[d]elay shall be considered to be agreed to by the defendant." 725 ILCS 5/103-5(a) (West 2016). To the State's proposed first continuance, defendant made no objection in the statutorily prescribed manner. It follows that defendant is considered to have agreed to the first continuance and he has no valid statutory speedy-trial claim.

¶ 46     That being the case, defense counsel could not have rendered ineffective assistance by omitting to file a motion for discharge on statutory speedy-trial grounds or by refraining from raising the issue in the posttrial motion. See *People v. Peco*, 345 Ill. App. 3d 724, 735-36 (2004). To render effective assistance, defense counsel need not file futile motions. *People v. Smith*, 2014 IL App (1st) 103436, ¶ 64. Defendant does not argue it was ineffective assistance for defense counsel to omit to demand a trial when objecting to the State's first motion for a continuance. Therefore, any such argument would be forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (providing that "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

¶ 47          B. The Right to a Jury Selection That is Open to the Public

¶ 48     On appeal, defendant contends that, by asking spectators to leave the courtroom so as to make room for the potential jurors, the circuit court violated his constitutional right to have the jury selected in a proceeding that was open to the public. See *Presley v. Georgia*, 558 U.S. 209, 213 (2010).

¶ 49     The record is insufficient to support that contention. We cannot tell, from the record, if any spectators *ultimately* were excluded from the courtroom. Officer Helm might have brought them all back in after the first 12 potential jurors were seated in the jury box. How many spectators were in the courtroom to begin with? And were all of them or only some of them brought back in? The record appears to give no answer. To quote from *People v. Radford*, 2018 IL App (3d) 140404, ¶ 51, "we cannot know whether a closure occurred."

¶ 50     In his petition for rehearing, defendant disagrees. According to him, it is indeed knowable, from the transcript of March 6, 2017, that a closure occurred. We quote from defendant's petition for rehearing:

"Between the time that all spectators were directed to leave the courtroom [citation] and the time that the first 12 veniremembers were seated in the jury box [citation], portions of the jury selection process occurred, including: the trial court's reading of the charges [citation], the list of potential witnesses [citation], and the initial jury instructions [citation]; and the swearing-in of the veniremembers."

Defendant grants that it is unknowable, from the record, how many spectators were in the courtroom to begin with and whether all of them or only some of them were brought back in after the first 12 venire members were seated in the jury box. Nevertheless, defendant argues, unless one were to infer—improbably—that (1) all the spectators disobeyed the court's order to leave the courtroom and (2) the court let the disobedience pass without comment, "*all spectators* were excluded from the courtroom during identifiable and significant portions of the jury selection process," namely, the portions listed in the quotation above. (Emphasis in original.)

¶ 51    In all the cases that defendant cites, though, in which spectators were excluded from "the jury selection process," they were excluded while jurors were being selected: in other words, during the *voir dire* itself. See *Weaver v. Massachusetts*,__ U.S.___, ____, 137 S. Ct. 1899,  1905 (2017); *Presley v. Georgia*, 558 U.S. 209, 210 (2010); *People v. Evans*, 2016 IL App (1st) 142190, ¶ 3; *People v. Willis*, 274 Ill. App. 3d 551, 553 (1995). Our supreme court has held that "[t]he public trial right extends to *jury selection*." (Emphasis added.) *People v. Radford*, 2020 IL 123975, ¶ 25. Likewise, the Supreme Court of the United States has held that "the Sixth Amendment right to a public trial extends to the *voir dire* of prospective jurors." *Presley*, 558 U.S. at 213. "*Voir dire*" means "a preliminary examination to determine the competency of a witness or    juror."    Merriam-Webster    Online    Dictionary,    https://www.merriam-webster.com/dictionary/voir%20dire (last visited Oct. 28, 2020). When the circuit court read to

the prospective jurors the charges, a list of potential witnesses, and initial jury instructions and when the court swore them in, no prospective jurors were being examined, and no jurors were being selected. We do not see how the absence of spectators during these preliminary procedures implicated defendant's right to a public trial. See *State v. Parks*, 363 P.3d 599, 602-03 (Wash. Ct. App. 2015). If the spectators were let back into the courtroom as soon as the first 12 venire members were seated in the jury box, the spectators then would be able to see that the jurors were "fairly and openly selected." *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 509 (1984) (explaining that "public proceedings vindicate the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct by jurors fairly and openly selected"). Absent a contrary showing from the record, we presume that the selection of jurors in this case was open to the public. See *People v. Hillis*, 2016 IL App (4th) 150703, ¶ 106. Therefore, we find no proven violation of the constitutional right to a public trial (see *Radford*, 2020 IL 123975, ¶ 25), and we deny defendant's petition for rehearing.

¶ 52                              C. The *Zehr* Instructions to the Potential Jurors

¶ 53          Under Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), the circuit court must admonish each potential juror on four constitutional principles that are essential to a fair trial. Also, the court must ask each potential juror if he or she understands and accepts those principles. The rule provides as follows:

> "(b) The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his

- 16 -

or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." *Id.* These are *Zehr* admonitions and inquiries, so named after *People v. Zehr*, 103 Ill. 2d 472 (1984).

¶ 54 In the present case, *Zehr* admonitions were given, and *Zehr* inquiries were made. On appeal, however, defendant asserts violations of Rule 431(b).

¶ 55 Defendant acknowledges that, in the proceedings below, he never objected to any noncompliance with Rule 431(b), let alone reiterated the objection in a posttrial motion. "[B]oth a trial objection and a written post-trial motion raising the issue are necessary to preserve an issue for review." *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Nevertheless, defendant seeks to avert the procedural forfeiture by again invoking the doctrine of plain error. This time, he relies on the first prong of the plain-error doctrine instead of the second prong. That is, instead of arguing that the alleged Rule 431(b) errors were so inherently serious that they require automatic reversal, he argues that that the evidence in the trial was "closely balanced" and that the "clear or obvious" violations of Rule 431(b) "threatened to tip the scales of justice against" him. (Internal quotation marks omitted.) *Sebby*, 2017 IL 119445, ¶ 48. In other words, the reputed errors, regardless of how serious they were in themselves, could have nudged the decision from not guilty to guilty, given the closeness of the evidence.

¶ 56 According to defendant, the circuit court clearly or obviously violated Rule 431(b) in two ways.

¶ 57    First, the circuit court asked the potential jurors if they would "follow" its "instructions" on the *Zehr* principles instead of asking them if they would "accept" those "principles." Under Rule 431(b), the court was supposed to "ask each potential juror, individually or in a group, whether that juror underst[ood] and *accept*[*ed*]" the *Zehr* "principles," not whether that juror understood and would "follow" "instructions" on the *Zehr* principles. (Emphasis added.) Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Defendant quotes from *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 35: "Trial courts must exercise diligence when instructing the jury of the *Zehr* principles as codified in Rule 431(b) and must not deviate in any way from the precise language chosen by the Illinois Supreme Court to be in that rule."

¶ 58    In that judicial *dictum*, however, *McGuire* did not go so far as to say that any deviation from the precise language in Rule 431(b) necessarily was reversible error. There is, after all, an opinion by the appellate court, *People v. Atherton*, 406 Ill. App. 3d 598, 611 (2010), finding no error in the substitution of "follow" for "accept." The appellate court held in *Atherton*: "[A]sking the potential jurors if they were 'willing to follow' the propositions was just another way of asking the potential jurors if they accepted those propositions. Thus, the trial court's questions as to those principles complied with Rule 431(b)." *Id. Atherton* is on directly point, and we see no compelling reason to reject *Atherton*. After all, to "follow" means "to accept as authority."    Merriam-Webster    Online    Dictionary,    https://www.merriam-webster.com/dictionary/follow (last visited Oct. 1, 2020) [https://perma.cc/8J2A-RFKY]. Taking our lead from *Atherton*, we find no error, let alone plain error, in the substitution of "accept" for "follow"—words that carry the same meaning.

¶ 59    The second error in the *Zehr* admonitions and inquiries, according to defendant, was lumping the four principles together instead of reciting one principle at a time and asking the

potential jurors if they understood and accepted that principle. If indeed this was an error, it was not a clear or obvious one. Nothing in the text of Rule 431(b) clearly requires delivering the admonitions piecemeal with the inquiries interspersed. As defendant admits, the appellate court is divided on the question of whether it is necessary to do so. *Cf. People v. Willhite*, 399 Ill. App. 3d 1191, 1196-97 (2010) (observing that "Rule 431(b) has no requirement that the trial court ask separate questions of the jurors about each individual principle"); *People v. Othman*, 2019 IL App (1st) 150823, ¶ 60 (holding that, after stating each of the four *Zehr* principles, the circuit court must ask the potential jurors if they understand and accept that principle, necessitating eight inquiries). Because it was not a clear or obvious error for the circuit to follow *Willhite* over *Othman*, the procedural forfeiture of this issue will be honored. See *People v. Albea*, 2017 IL App (2d) 150598, ¶ 17.

¶ 60                                   D. The Asserted Error in a Jury Instruction

¶ 61            Counts IV to VII of the information charged defendant with committing, on July 26, 2017, four separate offenses of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(3) (West 2016)). Count IV alleged that he fired in the direction of one police officer, Demko. Count V alleged that he fired in the direction of a second police officer, Ferriman. Count VI alleged that he fired in the direction of a third police officer, Donovan. Count VII alleged that he fired in the direction of a fourth police officer, Derouchie.

¶ 62            During its deliberations, the jury sent out a written inquiry regarding those four counts. The note read: " 'Does suspect need to know there were four cops on the scene in the area where gun was fired to be guilty of all four counts of aggravated discharge of a firearm[?] Third proposition, that the Defendant knew that blank was a peace officer.' " (We quote from the transcript.)

¶ 63        Defense counsel objected to any answer beyond simply referring the jury to the instructions already given. Over defense counsel's objection and with the State's approval, the circuit court sent in to the jury the following written answer:

> "Question #1
>
> No[.]
>
> Question #2
>
> You must determine based on the evidence which officer or officers, if any, may have been in the line of fire when the firearm was discharged."

¶ 64        On appeal, defendant makes the indisputable point that if the circuit court chooses to give a clarifying instruction to the jury, the instruction should be accurate—it should be a correct statement of the law. See *People v. Childs*, 159 Ill. 2d 217, 229 (1994). Defendant maintains that the clarifying instruction the circuit court gave was an incorrect statement of the law. It was incorrect, he argues, in that it reduced the State's burden of proof as to two elements of aggravated discharge of a firearm, thereby violating his right to due process. See *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009).

¶ 65        The statute defining aggravated discharge of a firearm provides as follows:

> "(a) A person commits aggravated discharge of a firearm when he or she knowingly or intentionally:
>
> * * *
>
> (3) Discharges a firearm in the direction of a person he or she knows to be a peace officer *** while the officer *** is engaged in the execution

- 20 -

of any of his or her official duties ***[.]" 720 ILCS 5/24-1.2(a)(3) (West 2016).

Defendant divides this statutory definition into four elements: "(1) knowing or intentional discharge of a firearm, (2) in the direction of a person who is a peace officer, (3) with knowledge that such person is a peace officer, (4) in connection with the officer's official duties."

¶ 66    By its clarifying instruction, defendant argues, the circuit court lightened the State's burden of proof on the second and third of those elements. The court instructed the jury: "You must determine[,] based on the evidence[,] which officer or officers, if any, *may* have been in the line of fire when the firearm was discharged." (Emphasis added.) According to defendant, this instruction, with its noncommittal language of possibility ("may"), excused the State from proving two propositions *beyond a reasonable doubt*: (1) defendant's discharge of a firearm was in the direction of a peace officer and (2) defendant knew that the person was a peace officer. Relieved of much of its evidentiary burden, defendant argues, the State only had to prove that (1) defendant's discharge of firearm *may* have been in the direction of a peace officer and (2) defendant knew that this person *may* have been a peace officer.

¶ 67    This argument assumes an equivalence between the phrase "in the line of fire" and the phrase "in the direction of" (*id.*). Do these phrases have the same meaning? If being "in the line of fire" means the same as having a firearm discharged "in the direction of" oneself, then defendant's reasoning is valid: the phrase "may have been the line of fire" lightened the State's burden of proof to (1) defendant's discharge of firearm *may* have been in the direction of a peace officer and (2) defendant knew that this person *may* have been a peace officer.

¶ 68    But being "in the line of fire" has a different meaning from having a firearm discharged "in the direction of" oneself. The "line of fire" means "the place where bullets are being

- 21 -

shot." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/line%20of%20fire (last visited Oct. 1, 2020) [https://perma.cc/SJK6-2M48]. Or, as another dictionary defines the phrase, the "line of fire" is "the expected path of gunfire." New Oxford American Dictionary 991 (2001). Thus, anyone remaining in the line of fire when a firearm is discharged will be hit. Being in the line of fire means being in the expected trajectory of the round. The line is the path of the round, and anyone who intersects that line is in the line of fire. By contrast, the phrase "in the direction of" is more approximate. It means "so as to be approaching" or "toward." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/in%20the%20direction%20of (last visited Oct. 1, 2020) [https://perma.cc/DGR8-NPC4]. To "approach" means "to draw closer to" or "to come very near to." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/approach (last visited Oct. 1, 2020) [https://perma.cc/2SJ9-AY3D].

¶ 69 To illustrate this distinction, let us say that, with the intention of merely scaring *A*, *B* carefully aims at a window to the side of *A* and shoots out the glass. *A* would not be in the line of fire, and, when pulling the trigger, *B* would know that *A* was not in the line of fire. Nevertheless, *B* would fire in *A*'s direction, and *B* would know he was firing in *A*'s direction.

¶ 70 Because of the differing meanings of "in the line of" and "in the direction of," we are unconvinced that the clarifying instruction lightened the State's burden of proof on the second and third elements of aggravated discharge of a firearm, as defendant argues. Thus, prejudice from the clarifying instruction is unproven. See *People v. Williams*, 2017 IL App (1st) 142733, ¶ 50 (holding that "[i]t is the defendant's burden to demonstrate prejudice resulting from an alleged instruction error").

¶ 71 E. Surplus Convictions of Aggravated Discharge of a Firearm

¶ 72    After the first round of briefs in this appeal, we were left with reservations about the multiple convictions of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(3) (West 2016)). Therefore, we ordered supplemental briefing on the question of whether these multiple convictions violated the one-act, one-crime doctrine (see *People v. King*, 66 Ill. 2d 551, 566 (1977))—a violation that, if it occurred, would be reviewable as a plain error (see *People v. Smith*, 2019 IL 123901, ¶ 14).

¶ 73    The parties filed supplemental briefs. As we were reminded by some of the cases the parties cited in their supplemental briefs, a question of statutory construction must be answered before the one-act, one-crime doctrine becomes relevant. The threshold question is whether section 24-1.2(a)(3) (720 ILCS 5/24-1.2(a)(3) (West 2016)), by its terms, allows four convictions of aggravated discharge of a firearm for fewer than four shots fired in the direction of the four peace officers. See *People v. Carter*, 213 Ill. 2d 295, 300-01 (2004); *People v. Avelar*, 2017 IL App (4th) 150442, ¶ 16. Only if we construe section 24-1.2(a)(3) as allowing the four convictions should we then proceed to the further question of whether the four convictions violate the one-act, one-crime doctrine. See *Carter*, 213 Ill. 2d at 301.

¶ 74    To be sure, the statute would have allowed a separate conviction for each *shot* that defendant had fired in the direction of the peace officers. Each shot would have been a "[d]ischarge[ ]" that the statute criminalized. 720 ILCS 5/24-1.2(a)(3) (West 2016). And there was testimony that defendant had fired more than one shot.

¶ 75    But the trouble is this: in the charging instrument, the State did not differentiate between the shots that defendant had fired. Instead, in the charging instrument, the State differentiated between the peace officers that defendant had fired at. Similarly, in its closing argument to the jury, the State took the position that, regardless of the number of shots that

- 23 -

defendant had fired, the jury should return *four* guilty verdicts for aggravated discharge of a firearm: a guilty verdict for each of the four peace officers in the direction of which defendant had fired. It would be too late to change that theory now. See *People v. Crespo*, 203 Ill. 2d 335, 344 (2001) (stating it would not "allow the State to change its theory of the case on appeal"). The State is stuck with its one-conviction-per-peace-officer theory, be that theory valid or invalid—which is the question.

¶ 76     We must decide, then, whether section 24-1.2(a)(3) (720 ILCS 5/24-1.2(a)(3) (West 2016)) allows four convictions of aggravated discharge of a firearm to be carved out of the discharge of a firearm in the direction of four peace officers, regardless of the number of times the firearm was discharged—even if the firearm was discharged, say, only once. (It may as well have been only once since, according to the prosecutor's argument to the jury, the number of shots that defendant fired is unimportant and it is the number of peace officers he fired at that matters.) Like an alleged violation of the one-act, one-crime rule (see *Smith*, 2019 IL 123901, ¶ 14), this threshold question of statutory interpretation is reviewable under the plain-error doctrine, despite a procedural forfeiture (see *Carter*, 213 Ill. 2d at 299 (noting the supreme court's recent holding that " 'the potential for a surplus conviction and sentence affects the integrity of the judicial process, thus satisfying the second prong of the plain error rule' ") (quoting *People v. Harvey*, 211 Ill. 2d 368, 389 (2004))).

¶ 77     Under the unambiguous language of section 24-1.2(a)(3) (720 ILCS 5/24-1.2(a)(3) (West 2016)), the "allowable unit of prosecution" (internal quotation marks omitted) (*Carter*, 213 Ill. 2d at 302) is the "discharge[ ]" of the firearm, not the number of persons in the direction of which the firearm is discharged. Again, the statute reads as follows:

"(a) A person commits aggravated discharge of a firearm when he or she knowingly or intentionally:

* * *

(3) *Discharges* a firearm in the direction of a person he or she knows to be a peace officer *** while the officer *** is engaged in the execution of any of his or her official duties, or to prevent the officer *** from performing his or her official duties, or in retaliation for the officer *** performing his or her official duties ***[.]" (Emphasis added.) 720 ILCS 5/24-1.2(a)(3) (West 2016).

¶ 78        Nothing in the language of section 24-1.2(a)(3) justifies an interpretation that there is a separate offense of aggravated discharge of a firearm for every peace officer in the direction of which a round is fired. If the defendant knowingly or intentionally discharges a firearm once in the direction of four persons whom the defendant knows to be peace officers doing their jobs, the defendant has, *ipso facto*, in the language of the statute, "[d]ischarge[d] a firearm in the direction of *a person* he or she knows to be a peace officer *** while the officer *** is engaged in the execution of any of his or her official duties"—and the single violation of the statute is complete. (Emphasis added.) *Id.* As the statute is written, there is one offense per "discharge," not one offense per person in the group toward which the firearm is discharged. *Id.*

¶ 79        This is not to detract from our supreme court's statement in *People v. Shum*, 117 Ill. 2d 317, 363 (1987): "In Illinois it is well settled that separate victims require separate convictions and sentences." The offenses in *Shum*, however, were significantly different from the offense of aggravated discharge of a firearm. The offenses in *Shum* were the infliction of bodily harm upon two victims. The defendant in *Shum* killed Gwendolyn Whipple and her unborn child

(*id.* at 335), and he was convicted of murder and feticide (*id.* at 332). He argued to the supreme court that the one-act, one-crime doctrine required the reversal of his feticide conviction since "it arose from the single physical act of killing Gwendolyn Whipple." *Id.* at 363. The supreme court disagreed with the defendant's one-act, one-crime argument because "separate victims require[d] separate convictions and sentences." *Id.* Or, as the appellate court has put it, "the one-act, one-crime rule only applies to multiple convictions for acts against a single victim." *People v. Leach*, 2011 IL App (1st) 090339, ¶ 30.

¶ 80         It is important to keep in mind, though, that, by invoking the one-act, one-crime doctrine, the defendant in *Shum* implicitly conceded that convicting him of both murder and feticide was consistent with the legislature's intent. Again, "[o]ne-act, one-crime principles apply only if the statute is construed as permitting multiple convictions" for a single act. *Carter*, 213 Ill. 2d at 301. The defendant in *Shum* could not have seriously argued that if someone murdered a pregnant woman, the legislature intended to exempt the murderer from criminal liability for feticide. If, without justification, *A* fatally shoots *B* and the round passes through *B* and kills *C* as well, it cannot seriously be contended that the legislature intended to exempt *A* from criminal liability for the death of *C*. Common sense would suggest that "multiple harms to different people should lead to multiple convictions." *People v. Jackson*, 2016 IL App (1st) 133823, ¶ 64. Precisely because the legislature intended *A* to incur criminal liability for the death of *C*, *A* might invoke the one-act, one-crime doctrine. And no doubt courts would respond with the multiple-victims exception to the doctrine. See *Leach*, 2011 IL App (1st) 090339, ¶ 30. But that exception to the one-act, one-crime doctrine does not answer the *preceding* threshold question of legislative intent in our case. See *Carter*, 213 Ill. 2d at 300-01.

¶ 81    As we have explained, we see no textual evidence in section 24-1.2(a)(3) (720 ILCS 5/24-1.2(a)(3) (West 2016)) that a single discharge of a firearm in the direction of a group of peace officers may support multiple convictions of aggravated discharge of a firearm. In the way the statute is written, the unit of prosecution is the "discharge," not the number of peace officers. *Id.* Even if the statutory language were ambiguous in this regard, the rule of lenity would require us to resolve the ambiguity in defendant's favor. See *People v. Jones*, 223 Ill. 2d 569, 581 (2006). But the statutory language is not ambiguous. One discharge equals one offense.

¶ 82    We acknowledge that this interpretation of section 24-1.2(a)(3) is at odds with the appellate court's interpretation of that section in *People v. Hardin*, 2012 IL App (1st) 100682, ¶ 37. In *Hardin*, though, the appellate court stated an interpretation that was undisputed in the appeal it was deciding. The appellate court took the issue as the parties had framed it. Consequently, *Hardin* is of little help. To explain what we mean, let us begin with the facts in *Hardin*.

¶ 83    In *Hardin*, the defendant, as he was running away, turned and fired a single shot at a car occupied by two police officers. He was convicted of two counts of aggravated discharge of a firearm in the direction of a vehicle known to be occupied by a peace officer (720 ILCS 5/24-1.2(a)(4) (West 2008)): one count for each of the two peace officers. *Hardin*, 2012 IL App (1st) 100682, ¶ 1.

¶ 84    Notice, first of all, that the defendant in *Hardin* was charged under a different subsection of section 24-1.2 than the subsection under which defendant in the present case was charged. In the present case, defendant was charged under subsection (a)(3) (720 ILCS 5/24-1.2(a)(3) (West 2016)), which criminalized "[d]ischarg[ing] a firearm *in the direction of a person* he or she knows to be a peace officer." (Emphasis added.) *Id.* In *Hardin*, by contrast, the

- 27 -

defendant was charged under subsection (a)(4) (720 ILCS 5/24-1.2(a)(4) (West 2008)), which criminalized " '[d]ischarg[ing] a firearm *in the direction of a vehicle* he or she knows to be occupied by a peace officer.' " (Emphasis in original.) *Hardin*, 2012 IL App (1st) 100682, ¶ 26 (quoting 720 ILCS 5/24-1.2(a)(4) (West 2008)).

¶ 85   The defendant in *Hardin* argued that, under the one-act, one-crime doctrine, one of his convictions of aggravated discharge of a firearm should be vacated. *Id.* ¶ 23. He did not dispute that there had been two peace officers in the car. Even so, the defendant got around the multiple-victims exception this way. "[H]is convictions," he reasoned, "were for shooting at the vehicle itself, and not the officers located inside, and he fired one shot at one police vehicle." Thus, he concluded, he deserved no more than one conviction of aggravated discharge of a firearm: a single shot at a vehicle, a single conviction (720 ILCS 5/24-1.2(a)(4) (West 2008)). *Hardin*, 2012 IL App (1st) 100682, ¶ 25. The State argued, on the other hand, that the two convictions should stand because the single shot victimized the two peace officers occupying the vehicle and, surely, "the criminal statute at issue was designed to protect them, and not the vehicle." *Id.*

¶ 86   Now let us pause here to make a crucial observation about *Hardin*. In their arguments to the appellate court, both parties in *Hardin* assumed that, if indeed the defendant had fired the single shot *at the two peace officers*, the two convictions of aggravated discharge of a firearm were legitimate. But the defendant insisted that he had fired the single shot not at the two peace officers but, instead, at *their vehicle*. That was, after all, the theory the State had pleaded in its charging instrument. The State countered that, by firing the single shot at the vehicle occupied by the two peace officers, the defendant had fired at the two peace officers and that his attempted distinction between firing at them and firing at their vehicle was meaningless.

¶ 87        The appellate court was unconvinced that the defendant's distinction between firing at the two peace officers and firing at their vehicle could be dismissed as meaningless considering that this was the very distinction the legislature had drawn in subsections (a)(3) and (a)(4) of section 24-1.2 (720 ILCS 5/24-1.2(a)(3), (4) (West 2008)). See *Hardin*, 2012 IL App (1st) 100682, ¶ 27. "[S]ubsection (a)(4) [had to] be interpreted to prohibit the act of discharging a firearm in the direction of the vehicle, and not the officer, to ensure that it ha[d] meaning and [was] not superfluous." *Id.* ¶ 29. The defendant had violated subsection (a)(4) by firing one shot at a vehicle occupied by peace officers. *Id.* ¶ 26. Given the charge, the defendant could "only be convicted of one crime under the statute's plain language." *Id.*

¶ 88        The appellate court in *Hardin* added:

> "*If [the] defendant had been charged under subsection (a)(3) [(720 ILCS 5/24-1.2(a)(3) (West 2008))] and the State had met its burden of proof, then [the] defendant could have been convicted of two crimes because his criminal act would have been directed at two people*. However, [the] defendant was charged and convicted under subsection (a)(4) [(*id.* § 24-1.2(a)(4))], which defines the criminal act as the discharge of a firearm at a vehicle. As such, we determine that [the] defendant has committed one criminal act under subsection (a)(4) where he fired his gun one time at one vehicle and conclude that he may therefore be convicted of only one crime." (Emphasis added.) *Id.* ¶ 37.

¶ 89        The *dictum* we emphasized in that quoted passage was undisputed in *Hardin*. But it is disputed in the present case. Because defendant disagrees that, under subsection (a)(3) (720 ILCS 5/24-1.2(a)(3) (West 2016)), a single discharge can yield multiple convictions corresponding to the number of peace officers, *Hardin* is distinguishable.

¶ 90        As we have explained, under the unambiguous language of section 24-1.2(a)(3), the discharge of the firearm is the unit of prosecution, not the number of persons at which the firearm was discharged. It follows, by the way, that the circuit court was correct when it answered, "No," to the jury's question "Does [the] suspect need to know there were four cops on the scene in the area where the gun was fired to be guilty of all four counts of aggravated discharge of a firearm[?]" Instead of knowing the precise number of peace officers, the suspect would have to know, rather, that he fired the gun four times in the direction of at least one peace officer. That is because, in section 24-1.2(a)(3), the victim the legislature had in mind was public order, not the person fired at. Unlike aggravated assault (720 ILCS 5/12-1(a) (West 2018)), which is in part B of Title III of the Criminal Code of 2012, a part titled "Offenses Directed Against the Person," aggravated discharge of a firearm (*id.* § 24-1.2(a)(3)) is in part D of Title III, a part titled "Offenses Affecting Public Health, Safety[,] and Decency." Part D also includes disorderly conduct (*id.* § 26- 1). Carving multiple convictions of aggravated discharge of a firearm out of a single discharge of a firearm is as misguided as carving, say, 30 convictions of disorderly conduct out of a single late- night drunken rant: a conviction for each person in the neighborhood whose sleep was disturbed. If only one episode of disorderly conduct is pleaded, only one conviction of that offense can result. Likewise, if only one aggravated *discharge* of a firearm was pleaded, only one conviction of that offense can result.

¶ 91        In the charging instrument, the State differentiated between peace officers instead of between discharges of the firearm in their direction. Effectively, then, only one discharge was pleaded: the State "portray[ed] defendant's conduct as a single attack" on four peace officers (*Crespo*, 203 Ill. 2d at 343-44). In our *de novo* construction of section 24-1.2(a)(3) (see *Carter*, 213 Ill. 2d at 301), we conclude, therefore, that only one conviction of aggravated discharge of a

firearm is permissible. Having so interpreted the statute, we do not reach the one-act, one-crime doctrine, let alone the multiple-victims exception to that doctrine. See *id.*

¶ 92 That leaves the question of a remedy. For three of the convictions of aggravated discharge of a firearm, the circuit court imposed 10-year prison sentences, and for the fourth conviction of that offense, the court imposed a 40-year prison sentence. Some of the prison terms were concurrent with one another, and other prison terms were consecutive to one another. Given the differing prison terms and the web of concurrent and consecutive sentencing, resentencing appears to be necessary. Therefore, we remand this case with directions to vacate three of the convictions of aggravated discharge of a firearm and to resentence defendant in accordance with section 5-8-4 of the Unified Code of Corrections (730 ILCS 5/5-8-4 (West 2016)). See *People v. Artis*, 232 Ill. 2d 156, 179 (2009).

¶ 93 III. CONCLUSION

¶ 94 In sum, there was no violation of the speedy trial statute. The alleged violations of Rule 431(b) are procedurally forfeited and are not saved by the doctrine of plain error. We reject, on their merits, the remaining theories of ineffective assistance, a violation of the right to a public trial, and a faulty jury instruction. But we vacate three of the convictions of aggravated discharge of a firearm as statutorily unauthorized surplusage, given the charges. Therefore, we remand this case with directions to vacate three of the four convictions of aggravated discharge of a firearm— leaving to the circuit court to decide which three convictions to vacate—and to resentence defendant. Otherwise, we affirm the circuit court's judgment.

¶ 95 Affirmed in part and vacated in part; cause remanded with directions.

**No. 4-17-0787**

| | |
|---|---|
| **Cite as:** | *People v. Hartfield*, 2020 IL App (4th) 170787 |
| **Decision Under Review:** | Appeal from the Circuit Court of Champaign County, No. 16-CF-1055; the Hon. Thomas J. Difanis, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Amy J. Kemp, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, David J. Robinson, and James Ryan Williams, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |