2021 IL App (1st) 172569-U

THIRD DIVISION
July 28, 2021

No. 1-17-2569

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 16711 |
| | ) | |
| JAUAN O'NEAL | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed in part, reversed in part, remanded for resentencing. Convictions for second-degree murder and aggravated discharge of firearm did not violate one-act, one-crime rule, as offenses had different victims. Trial court lacked authority to modify defendant's sentences on State's motion. Consideration of void prior conviction as aggravating sentencing factor was plain error warranting remand for resentencing.

¶ 2    A jury convicted defendant Jauan O'Neal of felony murder, the predicate offense of aggravated discharge of a firearm, and second-degree murder. On direct appeal, we reversed defendant's felony-murder conviction, holding that aggravated discharge was not a proper predicate offense for this charge. *People v. O'Neal*, 2016 IL App (1st) 132284.

¶ 3    On remand, the trial court imposed consecutive sentences of 20 years and 15 years, respectively, on the remaining charges of second-degree murder and aggravated discharge. In

this appeal, defendant raises three issues arising from the resentencing proceedings on remand. He argues that his conviction for aggravated discharge must be vacated under the one-act, one-crime rule; that the trial court lacked authority to impose consecutive sentences, on the State's motion, after it initially imposed concurrent sentences; and that he is entitled to resentencing, on a theory of plain error or ineffective assistance of counsel, because his sentence was improperly based, in part, on a void prior conviction. The State agrees with his second point, and we agree with defendant on the third as well.

¶ 4     Because the facts of the offense are set forth in detail in our opinion on direct appeal, we proceed directly to defendant's arguments, filling in only the necessary factual background as it becomes relevant to our analysis of these limited issues.

¶ 5                                  I. One-Act, One-Crime

¶ 6     Defendant fired at least five gunshots at a van as it drove down the street. He claimed he was acting in self-defense: The van, or so he believed, was occupied by one or more rival gang members who were about to launch an attack. One errant bullet struck and killed an unintended victim, defendant's friend Darius Murphy, who was sitting in a parked car.

¶ 7     In addition to the now-reversed felony-murder count, the jury found defendant guilty of two offenses: (1) the second-degree murder of Murphy, based on unreasonable self-defense and the principle of "transferred intent," and (2) aggravated discharge of a firearm "in the direction of a vehicle that he knew or should have known to be occupied by a person." These two convictions are the subject of defendant's one-act, one-crime challenge. Because the challenge raises purely legal questions, our review is *de novo. People v. Coats*, 2018 IL 121926, ¶¶ 11-12.

¶ 8     Defendant argues that both convictions cannot stand under the one-act, one-crime rule, and more specifically the holding of *People v. Crespo*, 203 Ill. 2d 335 (2001), because the State

failed to "differentiate" between his gunshots. To understand what this claim comes to, and why it ultimately fails, it is important to clarify the meaning and purpose of "differentiating" or "apportioning" conduct between multiple offenses, as articulated in *Crespo*.

¶ 9 The defendant in *Crespo* stabbed a victim, Arlene, three times. *Id.* at 339. Among other counts not relevant here, the State charged two counts of aggravated battery—one based on causing great bodily harm, and one based on using a deadly weapon—and one count of armed violence, predicated on the great-bodily-harm aggravated battery. *Id.* After a jury found him guilty on all three counts, the trial court merged the aggravated batteries and imposed two sentences arising from the stabbing of Arlene—one for aggravated battery, and one for armed violence. *Id.* at 339-40.

¶ 10 The defendant argued that the remaining aggravated battery should have been vacated under the one-act, one-crime rule, because it was based on the same conduct or "physical act" as the armed-violence conviction, namely, the stabbing of Arlene. *Id.* The State—advancing a new theory on appeal—responded that each stab wound was "a separate and distinct act[ ]," in the sense that it "properly constitute[d] a separate offense," and was thus sufficient on its own to support a separate conviction and sentence. *Id.*

¶ 11 Our supreme court vacated the aggravated-battery conviction. True, the State *could have* sought separate convictions and penalties for each of the three stab wounds. *Id.* at 344. To do so, the State had to set forth each stab wound as an independent basis for a conviction and sentence. That is what the supreme court meant when it said that the State was required to "differentiate" between the stab wounds and "apportion" them among the charges. *Id.* But the State didn't do that. Rather, in the indictment and at trial, the State presented the charges as alternative "theories

of criminal liability" for "the same conduct"—a single "undifferentiated" "attack" on Arlene that comprised three stab wounds. *Id.* at 342-43.

¶ 12　As a result, the defendant was never put on notice that the State sought to convict him of three separate crimes, carrying three separate penalties—as opposed to one single crime that was charged and presented to the jury in three alternative guises. *Id.* at 343-45. To allow the State to change its "theory of the case" in this way on appeal would be "profoundly unfair," if not a violation of due process. *Id.*

¶ 13　Defendant does not dispute that multiple gunshots could support multiple convictions and sentences, including for the crimes charged and found here—but only, he claims, if the State apportions the gunshots among those charges. He says the State had to explicitly base at least one count of aggravated discharge on a gunshot *other than* the one that killed Murphy. And the State did not.  Rather, it proceeded at trial on only a single count of aggravated discharge, treating defendant's gunfire as one undifferentiated "cluster," and thus as a single physical act. As a result, says defendant, both of his convictions are based on the same physical act, which violates the one-act, one-crime rule. See, *e.g.*, *People v. Johnson*, 237 Ill. 2d 81, 97 (2010); *People v. King*, 66 Ill. 2d 551, 566 (1977).

¶ 14　Defendant's attempt to apply *Crespo* in this way overlooks a critical difference between the two cases: Here, defendant was charged with offenses against *different victims*. The State has always argued, and the trial court ruled, that the one-act, one-crime rule does not prohibit multiple convictions for this reason. We agree.

¶ 15　The one-act, one-crime rule " 'only applies to multiple convictions for acts against a single victim.' " *People v. Avelar*, 2017 IL App (4th) 150442, ¶ 25 (quoting *People v. Leach*, 2011 IL App (1st) 090339, ¶ 30)). Some courts have called this the "multiple-victims exception"

to the rule. *People v. Hartfield*, 2020 IL App (4th) 170787, ¶ 80. Other courts have expressed the same point by saying that "crimes committed against separate victims constitute separate criminal acts," even when those crimes were accomplished by means of a single physical action. *People v. Pryor*, 372 Ill. App. 3d 422, 434 (2007).

¶ 16     As we read the record, it was in *this* sense that the trial court found there were two acts in this case: "We have a moving van that the defendant is shooting at. And while it's moving and he's shooting at it, one of those rounds hits some other person who's not in the van, killing that person. That's two acts out there. This is not a one-act, one-crime scenario." In other words, the trial court was not saying, as defendant interprets this remark, that the State differentiated the gunshots within the meaning of *Crespo*; rather, the trial court was making the very point that underlies the multiple-victims exception to the one-act, one-crime rule. And not surprisingly, as that was the State's principal argument below.

¶ 17     Whatever the terminology, the point is a simple one: A single physical action, like firing a gun, can amount to multiple crimes against different victims. And "[i]n Illinois it is well-settled that separate victims require separate convictions." *People v. Kuntu*, 196 Ill. 2d 105, 131 (2001). A defendant who kills multiple people with a single bullet (or grenade, or something worse yet) is not absolved of responsibility for all but one of the deaths on the ground that he caused them all in one fell swoop.

¶ 18     Our supreme court's cases exemplify this basic and obvious point. In *Kuntu* (*id.*), a single fire set by the defendant killed one person and injured another; thus, the one-act, one-crime rule did not prohibit convictions for both murder and aggravated arson. In *People v. Shum*, 117 Ill. 2d 317, 363 (1987), the defendant shot a pregnant woman, killing her and her unborn baby; because "there were two distinct victims of the defendant's single action," the rule did not prohibit

convictions for both murder and feticide.

¶ 19    Here, regardless of whether the State alleged that defendant committed one physical act or multiple physical acts when he sprayed gunfire at the van, the fact remains that this conduct caused distinct harms to, and thus comprised different offenses against, different victims: the (second-degree) murder of Murphy, and an aggravated discharge that made victims of the van's occupants, however many there were. Thus, the one-act, one-crime rule does not prohibit separate convictions and sentences for these two offenses.

¶ 20    Defendant acknowledges the basic principle that underlies the multiple-victims exception. But he claims the exception does not permit multiple convictions here, for two principal reasons.

¶ 21    First, he says, the exception addresses the question "whether a differentiated act or acts can support multiple convictions." In other words, the exception can only be applied if the State has *first* differentiated the conduct at issue into multiple acts, as required by *Crespo*.

¶ 22    That is flat wrong. The fact that there were multiple victims of the defendant's conduct is *itself* sufficient to differentiate that conduct into multiple offenses under the one-act, one-crime doctrine. Put differently, differentiation by *act* and by *victim* are not successive stages in the one-act, one-crime analysis; they are alternative ways to differentiate or (as we are also apt to say) "carve" a defendant's conduct into multiple crimes.

¶ 23    When the State alleges that the defendant has committed crimes against multiple victims, there is generally no need to further distinguish between individual physical acts, be it gunshots or anything else, so as to apportion those acts between the various charged offenses. That was our point in *Avelar*, 2017 IL App (4th) 150442, and *Leach*, 2011 IL App (1st) 090339, both cited here by the State.

¶ 24     In *Avelar*, an order of protection prohibited the defendant from coming within a certain distance of his ex-girlfriend, L.H., or any of their three children. *Id.* ¶ 5. He picked up two of the children and took them to a restaurant and his house; as a result, L.H. had to come meet the defendant to pick them up. *Id.* ¶ 7.

¶ 25     The defendant was charged with three counts of violating the order of protection. *Id.* ¶ 6. Each count was based on a different *victim*. *Id*. The evidence certainly did not show three distinct acts—at the most, it showed two (approaching the children simultaneously, then later coming into contact with L.H. when she was forced to retrieve them). But the number of physical acts was irrelevant: "[E]ven if we construe defendant's alleged behavior as a single act, no one-act, one-crime violation exists because the State charged defendant with three counts of violat[ing] an order of protection against three different victims." *Id.* ¶ 26. We thus saw no need to further differentiate the offenses by physical act; three convictions were proper because there were three victims of the offense. *Id*.

¶ 26     The facts of *Leach*, 2011 IL App (1st) 090339, are complicated, but pared down to their relevant essentials, they are as follows. The defendant was convicted of the second-degree murder of one victim, Nicole, and one count of aggravated discharge. *Id.* ¶ 8. In a revised (and contested) jury instruction, the latter charge was presented as an aggravated discharge "in the direction of another person." *Id.*

¶ 27     The evidence showed clearly that the defendant deliberately shot Nicole twice during the course of an argument; he then fired at least one more round that went in the direction of a group of bystanders. *Id.* ¶¶ 7, 32. It was unclear whether the last shot was aimed at Nicole and went errant, or whether he was intentionally shooting at one more of the bystanders. See *id.* ¶ 7. (He was charged with, but acquitted of, the attempted murder of one of the bystanders. *Id.* ¶¶ 7-8).

¶ 28    The defendant argued on appeal that the revised instruction led the jury to convict him of aggravated discharge based on a gunshot he fired at Nicole; and since he was also convicted of Nicole's murder, the one-act, one-crime rule prohibited a separate conviction for aggravated discharge on that basis. *Id.* ¶ 28.

¶ 29    We held that the facts supported separate convictions. There was at least one bullet that did not strike Nicole (whether intended for her or not), but that did travel "in the direction of" the group of bystanders, and thus "in the direction of" at least one person *other than* Nicole. *Id.* ¶ 32. Thus, "even if we assume that defendant's action of firing his gun three times constitutes only a single act," the two offenses had different victims—and for that reason alone, the convictions did not violate the one-act, one-crime rule. *Id.* ¶ 33.

¶ 30    Arguably, the charged offenses in *Leach* were differentiated both by victim and by act. But the salient point, in both *Avelar* and *Leach*, is that differentiation by victim alone is enough to satisfy the one-act, one-crime rule.

¶ 31    Indeed, when a defendant has committed his crimes through what was indisputably a single physical act, a requirement of differentiating the charged offenses by act would be nonsensical and literally impossible to satisfy. Consider again the fire in *Kuntu*, 196 Ill. 2d at 130-31, that killed one victim and injured another, or the single gunshot that claimed two victims in *Shum*, 117 Ill. 2d at 363. What could it possibly mean to "differentiate" a burning fire or a single gunshot? Differentiate from what?

¶ 32    The *only* way to sustain multiple convictions and sentences in such a case, as our supreme court did, is to distinguish the charged offenses by their *victims*. The logical consequence of defendant's argument is that only one conviction could ever stand in such a case, regardless of the number of victims, because the State will always and necessarily fail to

"differentiate" the offenses by act. An arson that kills a hundred people in a building, a bomb that explodes and claims the lives of a dozen people, would only be punishable as a single murder. We reject that implication as meritless and as inconsistent with *Kuntu* and *Shum*.

¶ 33    Defendant's cited cases do not show, as he claims, that we have taken *Crespo* to prohibit separate convictions and sentences based on a single act, even where the act has multiple victims. In *People v. Beltran*, 327 Ill. App. 3d 682, 693 (2002), the defendant fired gunshots at three victims. He was convicted of one count each of attempt murder and aggravated discharge "[a]gainst each victim." *Id.* But "as to each victim," the State failed to specify which shots supported which charge. *Id.* Thus, "against each victim," he committed a single act that supported only a single conviction. *Id.* The attempt murder convictions as to each victim stood, and the aggravated discharge convictions as to each victim had to be vacated. *Id.*

¶ 34    Likewise in *People v. Guyton*, 2014 IL App (1st) 110450. The defendant fired numerous gunshots into a van, killing the driver, Saldivar, and injuring the passenger, Flores; he was convicted of Saldivar's murder, the attempted murder of Flores, and one count of aggravated discharge. *Id.* ¶¶ 1, 3-4, 15, 29, 32. Because the State failed to apportion the gunshots in the indictment, we vacated the aggravated discharge conviction. *Id.* ¶ 32. But that was not because the defendant was improperly convicted of crimes against different victims based on the same physical act. To the contrary, since he was convicted of an offense against each victim, a further conviction for aggravated discharge would have allowed him to be convicted of multiple offenses against the *same* victim based on a single act.

¶ 35    In *People v. Jimerson*, 404 Ill. App. 3d 621, 622 (2010), the defendant was convicted of four counts of aggravated battery of a peace officer and one count of mob action, all arising from a "jail melee" that he started. He argued on appeal that his mob-action conviction was based on

the same conduct as the aggravated-battery convictions and thus violated the one-act, one-crime rule. *Id.* at 635. We disagreed, finding that the State alleged multiple acts, some based on his own conduct, and others based on his accountability for the conduct of other inmates that led to injuries to multiple prison guards. *Id.* at 635-37. In no way does *Jimerson* suggest that a single act with multiple victims cannot sustain multiple convictions.

¶ 36     To be clear, there *are* limited circumstances in which a single physical act with multiple victims will not sustain multiple convictions. In particular, some criminal statutes permit only one conviction for each instance of the prohibited conduct, the statute's so-called unit of prosecution, no matter how many victims there were. Aggravated discharge is one such statute: It permits only one conviction *per discharge*. *Hartfield*, 2020 IL App (4th) 170787, ¶ 91 (subsection (a)(3); discharge in direction of a peace officer); *People v. Hardin*, 2012 IL App (1st) 100682, ¶ 31 (subsection (a)(4); discharge in direction of vehicle known to be occupied by peace officer).

¶ 37     But that is a point of statutory interpretation, distinct from the one-act, one-crime rule. *Hartfield*, 2020 IL App (4th) 170787, ¶¶ 79-80. Indeed, before even considering the possibility of a one-act, one-crime violation, the court "must first determine" whether the relevant statute "authorizes separate offenses to be charged." *People v. Almond*, 2015 IL 113817, ¶ 33; see also *People v. Carter*, 213 Ill. 2d 295, 301 (2004); *Avelar*, 2017 IL App (4th) 150442, ¶ 15.  And in any event, here, defendant was only convicted of one count of aggravated discharge.

¶ 38     That brings us to defendant's second point. He claims there was only *one* victim of his conduct—Murphy. Or at least that is how the State presented the case to the jury, he says: Murphy was the victim of an unintended murder, based on the principle of "transferred intent." But there was nary a word about the occupants of the van, admittedly the intended targets of

defendant's gunfire, being victims of the aggravated discharge.

¶ 39    Defendant hopes to evade the multiple-victims exception by painting a barrage of gunfire at an occupied vehicle as a victimless crime. We cannot agree. Even when the intended target of gunfire escapes unscathed, the danger to life and limb is no less present. The absence of physical harm does not imply the absence of any injury at all, in the legal sense of the term—the invasion of an interest that the law recognizes and protects.

¶ 40    The aggravated-discharge statute recognizes and protects a person's interest in not being subjected to the risk of bodily harm or death that comes with being put in the line of fire. That is no doubt why the statutory provision at issue requires that the defendant fire in the direction of a vehicle that he knows or reasonably should know to be "occupied by a person." 720 ILCS 5/24-1.2(a)(2) (West 2016). In this way, the legislature explicitly limited the statute's reach (and its significant Class 1 penalties) to conduct that has endangered—and thus victimized—a human being, and not merely created a risk of damage to a car.

¶ 41    Nor can we agree that the State presented this as a victimless crime at trial. The jury was well aware of the statute's requirement that the van had to be "occupied," both from the pattern instruction it received and from the prosecutor's closing argument that emphasized this very point. Indeed, the prosecutor argued not only that defendant knew the van was occupied when he opened fire—someone, after all, had to be driving it down the street—but also that defendant was *trying to kill* the occupants. True, the prosecutor did not explicitly say that the occupants of the van were "victims" of the aggravated discharge at the "occupied" van. But that implication may have seemed too obvious to bear mention.

¶ 42    And for what it's worth, the State did clarify at the hearing on remand that it viewed the occupants of the van as victims of the aggravated discharge. Addressing the point of statutory

interpretation at issue in *Harden* (and later *Hartfield*)—namely, that the statute permits only one conviction per discharge—the State argued, "Shooting at the vehicle, *everyone in the vehicle*, that's your victim." And again: "[T]he victim is the car *and the people inside it.*"

¶ 43 Lastly, nothing in our decision on direct appeal speaks to, much less settles in defendant's favor, the one-act, one-crime issue that he raises here. The question on direct appeal was whether the aggravated-discharge conviction could serve as a predicate for the felony-murder charge. See *O'Neal*, 2016 IL App (1st) 132284, ¶ 28. We held that it could not, for two reasons. First, defendant's act of shooting at the van was inherent in the act of causing Murphy's death, such that permitting a felony-murder charge would allow the State to circumvent the second-degree murder statute; and second, defendant's felonious purpose in discharging the firearm was not independent of the murder itself. *Id.* ¶ 40. In *that* context, we observed that "[t]he State never made any attempt to differentiate among the various shots in the cluster." *Id.* ¶ 42.

¶ 44 Defendant now takes that statement out of context and says, in so many words, that we all but decided his "*Crespo* claim" on direct appeal. We did nothing of the sort. The issue was not before us. And in any event, nothing that we said in reversing defendant's felony-murder conviction implied that he did not commit two offenses with separate victims. He did. Because the one-act, one-crime rule does not prohibit multiple convictions in these circumstances, we affirm defendant's conviction for aggravated discharge of a firearm.

¶ 45                                 II. Consecutive sentencing

¶ 46 On remand, the trial court sentenced defendant to 20 years in prison for second-degree murder, and 15 years for aggravated discharge. The trial court initially ordered the sentences to run concurrently. But after the State filed a "motion to correct sentence," in which it argued that the convictions were subject to mandatory consecutive sentencing, the trial court reversed its

initial determination and ordered the sentences to run consecutively.

¶ 47    Defendant argues that the consecutive-sentencing order violates *People v. Abdullah*, 2019 IL 123492. Although the procedural posture of this case is different, the State concedes that *Abdullah* nevertheless controls, since it holds that, once a trial court has imposed sentence, it may not modify that sentence on the State's motion. *Id.* ¶¶ 27-29, 33. The State thus concedes that "the trial court here erred by granting [the State's motion] and imposing consecutive sentences" and "the remedy is to reimpose the original concurrent sentences."

¶ 48    We appreciate and accept the State's concession. When, as in this case, the State contends that the trial court erred in failing to impose mandatory consecutive sentences, the State's remedy is to file a *mandamus* petition. *Id.* ¶¶ 29-30. Pending any relief that the State may secure in such a proceeding, our only recourse is to reinstate the original concurrent-sentencing order. *Id.* ¶ 35. Thus, defendant's sentences for second-degree murder and aggravated discharge are to run concurrently, unless and until the supreme court orders otherwise in any *mandamus* proceeding that the State may choose to pursue.

¶ 49                           III. Reliance on Void Prior Conviction

¶ 50    Apart from a juvenile disposition for cannabis possession, defendant's only purported criminal history was one adult conviction for aggravated unlawful use of a weapon (AUUW). There is no dispute that this conviction, which was obtained under subsection (a)(3)(A) of the AUUW statute—the very subsection declared facially unconstitutional in *People v. Aguilar*, 2013 IL 112116—was void. See 720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2016). Indeed, after the resentencing at issue, the AUUW conviction was vacated, and defendant was granted a certificate of innocence, on precisely these grounds.

¶ 51    Both the State and the trial court discussed the AUUW conviction as an aggravating factor. Defendant claims it was error for the trial court to rely on that AUUW conviction in aggravation, and we agree. See *In re N.G.*, 2018 IL 121939, ¶ 74; *People v. Cross*, 2019 IL App (1st) 162108, ¶¶ 182-87, 191-202.

¶ 52    Because the error is not preserved, defendant raises it under the alternative rubrics of plain error and ineffective assistance of counsel. The clearest and simplest resolution is second-prong plain error, as the consideration of an improper aggravating factor in sentencing "clearly affect[s] the defendant's fundamental right to liberty." *People v. Martin*, 119 Ill. 2d 453, 458 (1988); see also *People v. Sanders*, 2016 IL App (3d) 130511, ¶ 17 (consideration of improper aggravating factor constituted second-prong plain error).

¶ 53    A sentence based on an improper factor will be reversed unless the reviewing court "can determine from the record that the weight placed on the improperly considered factor was so insignificant that it did not lead to a greater sentence." *People v. Sherman*, 2020 IL App (1st) 172162, ¶ 52 (applying standard in context of second-prong plain error review); *People v. Grant*, 2019 IL App (3d) 170185, ¶ 28 (same). Our review of the record here does not reveal that the court's consideration of the AUUW conviction was so insignificant.

¶ 54    True, the lion's share of defendant's maximum sentences for second-degree murder and aggravated discharge (see 730 ILCS 5/5-4.5-30(a) (West 2016)) seemed attributable to the need to deter others from similar conduct. To this end, the trial court emphasized that the shooting in this case exemplifies an "actual day-to-day occurrence in Chicago." Thus, in the judge's mind, "[t]he sentence is absolutely necessary to deter others from committing the same crime. The community will be talking about the sentence that Jauan O'Neal gets. They will know about it."

¶ 55    Still, we cannot say that the improper consideration of the AUUW conviction led to *no* increase in the sentence. For one, the State actively encouraged the court to increase defendant's sentences based on his AUUW conviction. The State explicitly argued that the "aggravation" included his "conviction for unlawful use of a weapon." Later, the State argued that the mere possession of a firearm was "demonstratively felonious [*sic*]." Defendant "can't do that," the State maintained, because he was "a convicted felon"—"convicted," that is, of AUUW. And summing up, the State asked the trial court to impose the maximum sentences, in significant part because defendant "clearly had been caught with a weapon and incarcerated before that had no deterrent effect." Again, the only time he had been "caught with a weapon" was his AUUW case.

¶ 56    The trial court picked up on the State's themes, including its emphasis on defendant's emerging pattern of recidivist behavior, in two remarks singled out by defendant. First, while reviewing the factors in aggravation and mitigation, the trial court said this:

> "Any time you arm yourself with a weapon that you're not legally entitled to own because you have been a prior convicted felon of the offense of aggravated unlawful use of a weapon and gone to penitentiary is like a triple reason why you of all people should not be armed."

¶ 57    And speaking specifically to defendant's rehabilitative potential, a critical factor in any sentencing decision, the trial court returned to defendant's void AUUW conviction:

> "I think his rehabilitative potential is actually poor.
>
> The fact that he rearms himself after being convicted and sent to the penitentiary for a weapons charge is proof that his criminal conduct was a result of circumstances unlikely to—or likely to occur [*sic*]. That his rehabilitative potential is poor."

¶ 58    The trial court was identifying a pattern of recidivism, first noted by the State itself in its sentencing argument. Defendant had been convicted and sentenced for a gun offense, and now here he was again, committing offenses with a firearm. And he would likely *continue* to commit offenses with firearms, because he had a demonstrated *history* of arming himself, even after being punished for doing so. That is why the trial court found that the offenses were anything but the result of circumstances unlikely to recur. See 730 ILCS 5/5-5-3.1(a)(8) (West 2016).

¶ 59    Defendant's perceived recidivism, and not merely the illegality of his firearm possession, was thus the principal basis for the trial court's low estimation of his prospects for rehabilitation. But that perceived recidivism was explicitly and necessarily based on his prior AUUW conviction, which the trial court erroneously treated as an instance of criminal activity. To that extent, defendant's sentence appears to have been based, at least in some part, on his void prior conviction. (And even to the extent that the illegality of his firearm possession may have been part of the trial court's concern, the only reason the court cited for *why* defendant could not legally possess the murder weapon was his void AUUW conviction.)

¶ 60    We thus remand for resentencing. To be clear, we are *not* saying that the same sentences imposed by the trial court could not be re-imposed. It is for the trial judge to decide, in the first instance, what sentences are appropriate when the void AUUW conviction is eliminated from consideration. We hold only that the consideration of the AUUW conviction was plain error, and the record does not remove the possibility that this factor led to some increase in the sentence.

¶ 61                              CONCLUSION

¶ 62    We affirm defendant's aggravated-discharge conviction. We vacate his sentences for second-degree murder and aggravated discharge and remand for resentencing on these convictions. The sentences imposed by the trial court on remand are to run concurrently.

¶ 63    Affirmed in part; reversed in part; remanded with instructions.