2026 IL App (1st) 232252-U

No. 1-23-2252

Order filed April 27, 2026

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CR 06911 |
| | ) | |
| GAVEN LEON, | ) | Honorable |
| | ) | Sophia Atcherson, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Where defendant was convicted of two counts of aggravated discharge of a firearm in violation of the one-act, one-crime rule, we remand for the trial court to vacate the conviction on the less serious offense. However, neither conviction for aggravated discharge of a firearm violates the one-act, one-crime rule in relation to defendant's conviction for first degree murder. Defendant was proven guilty beyond a reasonable doubt of aggravated discharge of a firearm.

¶ 2    Following a bench trial, defendant Gaven Leon was convicted of one count of first degree murder and two counts of aggravated discharge of a firearm toward an occupied vehicle and

sentenced to an aggregate term of 58 years in prison. Defendant appeals, arguing his convictions violate the one-act, one-crime rule. In the alternative, defendant challenges the sufficiency of the evidence supporting his convictions for aggravated discharge of a firearm. We remand with directions for the trial court to vacate defendant's conviction on the less serious aggravated discharge of a firearm offense and otherwise affirm.

¶ 3        Defendant was charged, in connection with a shooting on February 3, 2022, with 18 counts of first degree murder of Ryan Balbag (counts I to XVIII) (720 ILCS 5/9-1(a)(1)-(3) (West 2022)) and 5 counts of aggravated discharge of a firearm in the direction of an occupied vehicle (counts XIX to XXIII) (*id.* § 24-1.2(a)(2)). Counts XIX and XXI alleged defendant "knowingly discharged a firearm in the direction of a vehicle he knew or should have known to be occupied by a person, to wit: Roberto Rivera." Counts XX and XXII alleged defendant "knowingly discharged a firearm in the direction of a vehicle he knew or should have known to be occupied by a person, to wit: Damian [Xavier Vazquez Jr.]." Count XXIII alleged defendant "knowingly discharged a firearm in the direction of a vehicle he knew or should have known to be occupied by a person." The State later nol-prossed six counts of felony murder (*id.* § 9-1(a)(3)) and proceeded with six counts each of intentional murder (*id.* § 9-1(a)(1)) and strong probability murder (*id.* § 9-1(a)(2)), in addition to the counts for aggravated discharge of a firearm.

¶ 4        At trial, Vazquez and Rivera testified to substantially the same account of events. On February 3, 2022, Vazquez, his business partner Balbag, and his employee Rivera closed their trading card store and left around 11 or 11:30 p.m. Balbag drove Vazquez and Rivera south on Pulaski Road to drop Rivera off at the train station. Vazquez sat in the passenger seat and Rivera sat in the rear passenger-side seat.

¶ 5    As the vehicle stopped at a red light at the intersection of Pulaski and Irving Park Road, Vazquez and Rivera heard a loud "popping" sound from the left. Balbag's airbag deployed, and Balbag slumped onto Vazquez's left shoulder. Vazquez attempted to rouse Balbag, who was unresponsive. The vehicle accelerated through the intersection and crashed into a building.

¶ 6    After the crash, Vazquez and Rivera exited the vehicle. Rivera called 911, and Vazquez observed the driver's side window "blown out" and blood streaming from Balbag's left eye. Vazquez pulled Balbag from the vehicle and attempted to keep him conscious. Police and paramedics arrived and transported Balbag in an ambulance.

¶ 7    Justyn Hutchinson, nicknamed "Justo," testified that he lived with defendant in an apartment on Irving Park in February 2022. Around 11:30 p.m. on February 3, 2022, defendant was lying on his bed using his phone and holding a tan and black "ghost gun" with a 30-round magazine. Defendant then pointed the firearm out the window and fired. Hutchinson could not tell whether the shot was fired upward or downward. The State asked how many times defendant fired the weapon, and Hutchinson responded, "Once." Afterward, Hutchinson and defendant went to a nearby gas station and watched police arrive, then returned to the apartment.

¶ 8    The State read part of a videotaped statement Hutchinson gave to police in May 2022. Hutchinson confirmed that, in the statement, he told police that on the night of February 3, 2022, defendant aimed his firearm out the window and fired twice "towards the ground." Hutchinson further confirmed that he stated, "[Defendant] shot it. The gun jammed. He took *** the bullet that got stuck in it, and the slide, he took it out and shot again."

¶ 9    On cross-examination, defendant's counsel asked, "I think you said two different things. That one shot or maybe two shots were fired?" Hutchingson replied, "It's two."

¶ 10    Christopher Emery testified that, on February 3, 2022, he had known defendant for three years and spoke to him daily. Around 11 p.m. that night, during a FaceTime call, defendant told Emery that defendant had discharged his firearm out his window at a vehicle because "somebody was braking their car engine and he was trying to sleep." Defendant did not know if he hit anyone. Defendant later texted Emery a photograph of police outside with the text, "they on me, they hot outside." The following morning, Emery went to defendant's apartment and observed that defendant had a black and tan "ghost Glock" with a green laser. Defendant repeated that he "shot the gun out the window" at a vehicle. About a week later, Emery drove defendant to the west side of Chicago, where defendant exchanged the Glock for a black Smith & Wesson.

¶ 11    Dr. Stephanie Powers, an assistant medical examiner with the Cook County Medical Examiner's Office, testified that she supervised and assisted with Balbag's autopsy and concluded that two gunshot wounds to the left side of his head caused his death. The autopsy recovered a copper jacket fragment from beneath Balbag's lower left eyelid and a bullet core from his right occipital lobe. Powers testified that the bullet had traveled from front to back, left to right, and downward, consistent with being fired from an elevated position.

¶ 12    Julio Hernandez testified that he performed maintenance at a building on the 3900 block of Irving Park, which contained approximately 50 units and had 16 security cameras. In February 2022, Hernandez met with Chicago police detectives and identified unit numbers that corresponded to exterior windows in a photograph of the building. He identified defendant in court as the occupant of unit 319.

¶ 13    Chicago police sergeant Aaron Acevedo testified that he served as a homicide detective on the case. Acevedo testified that the same bullet caused Balbag's two gunshot wounds. He

explained that as the bullet struck the vehicle window, the jacket fragmented and struck Balbag's eye, while the core continued into his skull.

¶ 14    Acevedo reviewed police observation device surveillance footage from the intersection of Pulaski and Irving Park, which showed a third-floor window of a building on the south side of the 3900 block of Irving Park open shortly before the shooting and close shortly afterward. Another officer met with Hernandez and determined the window belonged to unit 319, which defendant occupied. Acevedo later met with Hernandez to retrieve surveillance footage from the building.

¶ 15    The State published surveillance footage from the building showing a stairway between the second and third floors. The video includes the sound of two gunshots about 30 seconds apart at around 11:30 p.m. Video from another camera depicts two individuals leave unit 319 about 30 minutes later. Acevedo identified one of the individuals as defendant.

¶ 16    On February 16, 2022, police executed a search warrant at unit 319 while defendant was present. Police recovered several spent shell casings, multiple live rounds, the hoodie and flannel pants that Acevedo observed defendant wearing in the surveillance video, a bedspread, a window screen with a bullet hole, a laptop, and two cell phones. Police also collected samples from the window ledge for a gunshot residue kit.

¶ 17    The parties stipulated that samples from defendant's window ledge and flannel pants tested positive for gunshot residue.

¶ 18    Defendant provided the unlock code for his iPhone, and Acevedo obtained a search warrant for defendant's social media posts. The State entered into evidence defendant's social media posts and videos from his phone that depicted the intersection, the building, and the police response shortly after the shooting.

¶ 19    Chicago police detective Leonid Shvartser testified that a photograph defendant had sent via Snapchat showed a firearm that matched Hutchinson's and Emery's descriptions of defendant's "ghost gun." Another photograph from Snapchat showed a police vehicle at the intersection of Pulaski and Irving Park from an elevated view with a superimposed caption stating, "I Had Dese N*** Looking Real Slow," following by two laughing emojis. Shvartser further testified that the Illinois State Police determined that a "ghost gun" later recovered in an unrelated investigation had "a high confidence correlation" with the cartridge casings recovered from inside defendant's apartment. Defendant was arrested in May 2022.

¶ 20    Chicago police investigator Jon-Pierre Chenier testified that on September 29, 2022, he searched defendant's jail cell. During the search, Chenier discovered a manilla envelope bearing defendant's name with four unsent letters addressed to "Teejay" and "Joker," which the State entered into evidence. In the letters, the writer appeared to solicit Hutchinson's murder, stating, "I found out Justo did snitch *** he need to die Gang," and, "Ima Say Justo Did it it's not snitching if he dead."

¶ 21    In closing, the State emphasized the "overwhelming" evidence against defendant. The State recounted Hutchinson's statement that "he saw [defendant] shoot twice. The first [shot] he fired off. The second shot took some time because the gun jammed." The State concluded that defendant "pulled the trigger on the weapon that was recovered, discharged, killing Ryan Balbag while aiming at the other two occupants of his car."

¶ 22    Defense counsel questioned the credibility of Hutchinson and Emery and argued that police "rush[ed] to judgment" in identifying defendant as a suspect. Counsel also disputed whether two

shots were fired from the window, noting only one bullet hole was found in the window screen and Hutchinson seemed uncertain whether defendant fired once or twice.

¶ 23    The trial court found Hutchinson and Emery credible and determined that the evidence established defendant "guilty beyond a reasonable doubt on all remaining charges" and that defendant personally discharged the firearm during the commission of the offense. It explained that witnesses "can put the weapon in [defendant's] hand shooting out the third-story window at innocent people driving by."

¶ 24    The court denied defendant's motion for a new trial.

¶ 25    At sentencing, the court merged all murder counts into count I, intentional first degree murder (720 ILCS 5/9-1(a)(1) (West 2022)). It further merged counts XXI and XXIII into count XIX, aggravated discharge of a firearm toward a vehicle containing Rivera (*id.* § 24-1.2(a)(2)), and count XXII into count XX, aggravated discharge toward a vehicle containing Vazquez (*id.*). The court sentenced defendant to 25 years in prison on count I plus a mandatory 25-year firearm enhancement. It further imposed two 8-year sentences for counts XIX and XX, to be served concurrently to each other and consecutively to the murder sentence, for an aggregate term of 58 years in prison.

¶ 26    On appeal, defendant first argues that his convictions violate the one-act, one-crime rule, where his aggravated discharge of a firearm convictions were based on the same conduct as his murder conviction.

¶ 27    As an initial matter, defendant acknowledges that he forfeited the issue because he failed to allege any violation of the one-act, one-crime rule before the trial court. Nonetheless, he requests we review his claim for plain error. A claim that a conviction violates the one-act, one-crime rule

is reviewable under the second prong of plain error, as it affects the integrity of the judicial process. *People v. Smith*, 2019 IL 123901, ¶ 14. Plain error is error that is "clear or obvious." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 28    The one-act, one-crime rule prohibits multiple convictions based on the same physical act. *Smith*, 2019 IL 123901, ¶ 13. An act is "any overt or outward manifestation which will support a different offense." (Internal quotation marks omitted.) *Id.* ¶ 18. In applying the rule, we first determine whether defendant's conduct involved a single act or multiple acts; if the conduct involved multiple acts, we then determine whether any of the offenses is a lesser-included offense of another. *Id.* ¶ 15. If a defendant's convictions violate the one-act, one-crime rule, the conviction for the less serious offense must be vacated. *People v. Artis*, 232 Ill. 2d 156, 170 (2009). We review *de novo* whether a defendant's convictions violate the rule. *Smith*, 2019 IL 123901, ¶ 15.

¶ 29    When seeking multiple convictions based on closely related acts, the State must show its intent to apportion separate acts to separate charges. See *People v. Crespo*, 203 Ill. 2d 335, 344-45 (2001) (finding a violation of the one-act, one-crime rule where the State failed to apportion separate stabs to separate charges). Our supreme court has held that apportioning acts to separate counts for the first time on appeal "would be profoundly unfair." *Id.* at 343.

¶ 30    We first address defendant's two convictions for aggravated discharge of a firearm. The State concedes that one conviction for aggravated discharge of a firearm must be vacated, and we agree.

¶ 31    The State presented evidence that defendant fired two shots, one of which struck the vehicle occupied by Balbag, Vazquez, and Rivera, killing Balbag. Specifically, Hutchinson stated that

defendant fired twice downward from his window, and surveillance footage from the building recorded the sound of two gunshots.

¶ 32    Based on this evidence, the State could have charged defendant with aggravated discharge of a firearm based on separate discharges of the firearm and argued as much at trial. See, *e.g.*, *id.* at 344 (vacating conviction as against one-act, one-crime rule where the State could have, but did not, apportion three separate stab wounds among the charges). But neither the indictment nor the State's closing argument indicated that it intended to prosecute the two counts this way. Instead, it differentiated the counts by victim, not by discharge.

¶ 33    Generally, when there are multiple victims, multiple convictions are proper. *People v. Leach*, 2011 IL App (1st) 090339, ¶ 30; see also *People v. Shum*, 117 Ill. 2d 317, 363 (1987) ("In Illinois, it is well settled that separate victims require separate convictions and sentences."). However, our supreme has held that multiple convictions for aggravated discharge of a firearm in the direction of multiple victims, when based on a single discharge, violate the one-act, one-crime rule. *People v. Hartfield*, 2022 IL 126729, ¶¶ 91-94. As discussed, the State in this case prosecuted defendant's conduct as a single act of discharging a firearm in the direction of a vehicle occupied by Vazquez and Rivera. Therefore, because defendant's two convictions for aggravated discharge are based on the same act of discharging a firearm, they violate the one-act, one-crime rule. See *id.*

¶ 34    When two convictions violate the one-act, one-crime rule, we must vacate the less serious conviction. *People v. Hatcher*, 2024 IL App (1st) 220455, ¶ 69. To determine which offense is less serious, we first examine the potential punishment for each offense, then consider which has the more culpable mental state. *Id.* ¶ 67. Where, as here, the two convictions are identical, we cannot

determine which is more serious. See *id.* We thus remand to the trial court to determine which count of aggravated discharge of a firearm must be vacated. *Id.*

¶ 35   Next, we consider whether either of defendant's convictions for aggravated discharge of a firearm violate the one-act, one-crime rule in relation to defendant's conviction for first degree murder. The State maintains that they do not.

¶ 36   This court has held that "the one-act, one-crime rule only applies to multiple convictions for acts against a single victim." *Leach*, 2011 IL App (1st) 090339, ¶ 30. In *Leach*, the defendant shot a victim twice, killing her. *Id.* ¶ 7. He fired at least one more shot, which traveled toward a group of bystanders. *Id.* On appeal, the defendant argued the one-act, one-crime rule prohibited convictions for both second degree murder and aggravated discharge based on this course of conduct. *Id.* ¶ 28. This court held that the evidence supported a finding that the defendant fired two shots toward the victim and one toward the bystanders, and this third shot supported the defendant's conviction for aggravated discharge. *Id.* ¶ 32. The court explained it is "well settled" that crimes against separate victims are separate criminal acts, such that "even if we assume that defendant's action of firing his gun three times constitutes only a single act, the evidence shows that he committed a criminal act against at least two different victims." *Id.* ¶ 33.

¶ 37   This case is similar to *Leach*, in that defendant fired two shots out his window toward multiple victims. One shot struck and killed Balbag; the other bullet was not recovered. Nonetheless, even taken as one act, defendant's firing toward the vehicle containing Balbag, Vazquez, and Rivera supports convictions for both first degree murder and aggravated discharge without violating the one-act, one-crime rule. This is because "the one-act, one-crime rule only applies to multiple convictions for acts *against a single victim*." (Emphasis added.) *Id.* ¶ 30.

¶ 38     Defendant cites cases in which this court has vacated a conviction for aggravated discharge under the one-act, one-crime rule, where the defendant was also convicted of murder or attempted murder. See *People v. Green*, 339 Ill. App. 3d 443 (2003); *People v. Beltran*, 327 Ill. App. 3d 685 (2002); *People v. Amaya*, 321 Ill. App. 3d 923 (2001). However, in each of these cases, the vacated aggravated discharge conviction named *the same victim* as the murder or attempted murder conviction. In *Beltran*, for example, the defendant fired multiple shots at three victims and was convicted of one count of attempted murder and one count of aggravated discharge as to each victim, for a total of six convictions. *Beltran*, 327 Ill. App. 3d at 693. In vacating the aggravated discharge convictions, this court held that "against each victim, defendant committed a single act that supported only a single conviction." *Id.*

¶ 39     Here, by contrast, defendant's convictions are for distinct crimes committed against distinct victims. Therefore, the one-act, one-crime rule does not apply. See *Leach*, 2011 IL App (1st) 090339, ¶¶ 30, 33-34; see also *People v. Avelar*, 2017 IL App (4th) 150442, ¶ 26 (finding proper three convictions for violating a protective order based on a single act where each count named a different victim); *People v. O'Neal*, 2021 IL App (1st) 172569-U, ¶¶ 6-7, 19, 23 (same, where counts of second degree murder and aggravated discharge toward an occupied vehicle involved different victims) (Ill. S. Ct. R. 23(e)(1) (eff. June 3, 2025) (nonprecedential orders entered under Illinois Supreme Court Rule 23(b) may be cited as persuasive authority)).

¶ 40     In the alternative, defendant argues that insufficient evidence supports his aggravated discharge convictions because the State failed to prove he aimed the second shot at the vehicle.

¶ 41     When considering a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have

found the elements of the crime beyond a reasonable doubt. *People v. Jones*, 2023 IL 127810, ¶ 28; see also *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). We will not retry the defendant or substitute our judgment for that of the trier of fact regarding the weight of the evidence or the credibility of witnesses. *Jones*, 2023 IL 127810, ¶ 28. We allow all reasonable inferences in favor of the State and will not reverse unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Id.* Circumstantial evidence alone is sufficient to sustain a conviction. *People v. Grayer*, 2023 IL 128871, ¶ 28.

¶ 42    To sustain a conviction for aggravated discharge of a firearm toward an occupied vehicle, the State must prove the defendant (1) knowingly discharged a firearm, (2) in the direction of a vehicle he knew was occupied, and (3) was not justified in doing so. 720 ILCS 5/24-1.2(a)(2) (West 2022); *People v. Williams*, 2015 IL App (1st) 130097, ¶ 26.

¶ 43    Here, Hutchinson confirmed he told police that defendant discharged his firearm out the window and "towards the ground." Defendant himself told Emery during a FaceTime call the same night that he fired out his window at a vehicle because "somebody was braking their car engine and he was trying to sleep." The court found Hutchinson and Emery credible witnesses. See *People v. Gray*, 2017 IL 120958, ¶ 36 (the credible testimony of a single witness is sufficient to convict). Additionally, the building surveillance footage recorded two gunshots within 30 seconds at around 11:30 p.m. Based on this evidence, a rational trier of fact could conclude that defendant, without justification, discharged a firearm in the direction of a vehicle he knew was occupied.

¶ 44    Moreover, defendant "does not dispute that Bullet 1 was discharged in the direction of Balbag's vehicle." Rather, he contends that the aggravated discharge of a firearm conviction must be predicated on his discharge of "Bullet 2" to avoid violating the one-act, one-crime rule. The

second bullet was not recovered at the scene. As discussed above, however, defendant's firing at the vehicle, even taken as a single act, supports convictions for both murder and aggravated discharge against separate victims. See *Leach*, 2011 IL App (1st) 090339, ¶¶ 30, 33-34. Therefore, we need not determine whether the record supports a finding that the second shot was also fired toward the vehicle. Accordingly, we find the evidence sufficient to prove defendant guilty of aggravated discharge beyond a reasonable doubt.

¶ 45    For these reasons, we find that defendant's two convictions for aggravated discharge of a firearm in the direction of an occupied vehicle violate the one-act, one-crime rule, remand for the trial court to determine which conviction is the more serious offense, and direct the court to vacate the less serious conviction. We otherwise affirm the judgment of the circuit court of Cook County.

¶ 46    Affirmed and remanded with directions.